**WILLIAMS SARRANO,**                    :

    **Plaintiff**                    :

                         **CIVIL ACTION NO. 3:17-2398**

                         :

    **v.**                    :

                         **(JUDGE MANNION)**

**CITY OF SCRANTON,** *et al.*                    :

    **Defendants**                    :

## MEMORANDUM

Pending before the court in this §1983 civil rights action, in which plaintiff Williams Sarrano alleges that excessive force was used on him during his arrest, is a motion for summary judgment pursuant to Fed.R.Civ.P. 56 filed on behalf of defendants City of Scranton and Brett Griffiths, a police officer with the City's Police Department. (Doc. 17). For the reasons set forth below, the motion will be **GRANTED IN PART** and **DENIED IN PART**.

## I.    PROCEDURAL HISTORY

The plaintiff's December 27, 2017 complaint relates to events that occurred on July 12, 2017, when he was being arrested due to a domestic violence incident with his girlfriend by Officers of the Scranton Police Department ("SPD"), including Griffiths. (Doc. 1). During his arrest, plaintiff alleges that Griffiths unnecessarily used excessive force on him despite the fact that he did not resist. After plaintiff was transported to SPD Headquarters, he alleges that he had to be taken to the hospital for treatment to his face. As

a result of Griffiths' punches, plaintiff alleges that he sustained multiple facial fractures and that some of the damage resulted in permanent injuries.

In his complaint, plaintiff raises three counts. In Count I, plaintiff raises an excessive force claim pursuant to the Fourth, Eighth and Fourteenth Amendments against both defendants under 42 U.S.C. §1983. In Count II, plaintiff raises a state law assault claim, and in Count III, he raises a state law battery claim. Both state law claims are brought against only Griffiths.

As relief, plaintiff seeks compensatory damages as well as attorney's fees pursuant to 42 U.S.C. §1988. Plaintiff also alleges that "Griffiths' actions were willful, deliberate, malicious and/or reckless in that Griffiths carried out the [alleged acts of excessive force] subjectively knowing that his conduct was wrong." As such, plaintiff seeks punitive damages against Griffiths. Griffiths is sued in both his individual and official capacity.

On November 30, 2018, defendants filed the instant motion for summary judgment pursuant to Fed.R.Civ.P. 56, with respect to all three claims, arguing that plaintiff failed to present sufficient evidence that Griffiths used excessive force on him and, failed to show that the City had a custom, practice or policy that would support a municipal liability claim against it. (Doc. 17). Defendants simultaneously filed their statement of facts and exhibits as well as their brief in support of their motion. (Docs. 18-19). On December 19, 2018, plaintiff filed his response to defendants' statement of facts and his brief in opposition to the defendants' motion. (Docs. 21-22). Defendants did not file a reply brief and the time to do so has expired.

This court has jurisdiction over plaintiff's federal claim pursuant to [28 U.S.C. §1331](#) and §1343. This court has jurisdiction over plaintiff's state law claims pursuant 28 U.S.C. §1337. Venue is proper in this court under [28 U.S.C. §1391](#).

## II.   MATERIAL FACTS[1]

On July 11, 2017, plaintiff and his girlfriend, Tanya Saavadra, lived together at their house on Meadow Avenue in Scranton, PA, along with their children.

As a backdrop, plaintiff was previously arrested, incarcerated, and charged with assaulting Saavadra following a September 2014 incident at their house. Plaintiff pled guilty to a harassment charge as a result of the September 2014 incident. Saavadra also obtained a Protection from Abuse ("PFA") Order in Lackawanna County Court against plaintiff. Saavadra later dropped the PFA against plaintiff and he moved back into the house.

During the night of July 11, 2017, Saavadra left the house to go to the movies after having an argument with plaintiff in which he accused her of cheating on him. She also testified that she left because of the prior incident when plaintiff assaulted her and, that she decided to let him cool down to avoid another physical altercation. Saavadra returned to the Meadow Avenue

---

[1]The material facts are derived from defendants' statement of facts and plainitff's response to the statement, as well as the exhibits filed by the parties. The court only includes facts material to the issues in the case supported by the record, and it does not include legal conclusions.

3

house at approximately 1:30 a.m. on July 12, 2017.

After Saavadra returned to the house, plaintiff was waiting for her outside and resumed arguing with her, interrogated her regarding her whereabouts that evening, and accused her of cheating on him.

During the argument outside, plaintiff "got in her face" and Saavadra then began walking up the street towards a neighbor's house to escape plaintiff. Plaintiff then walked quickly behind Saavadra, and Saavadra later told Officer Griffiths that plaintiff grabbed her and pushed her to the ground. Saavadra also told Griffiths that plaintiff then started to drag her on the ground by her hair for about 10 feet.

In her deposition, Saavadra recanted her version of the July 12, 2017 incident that she told Griffiths at the scene and, corroborated plaintiff's version that he did not assault her. In their depositions, both Saavadra and plaintiff testified that plaintiff did not push Saavadra to the ground and did not drag her by the hair. Rather, plaintiff stated that Saavadra was angry over his comments and he thought she was going to attack him. He then stated that as Saavadra came at him, he moved out of the way causing her to slip. When she slipped, he stated that he grabbed her by the hair to stop her from falling onto a nearby car. Saavadra also testified that she slipped in her flip flop shoes and that plaintiff was trying to prevent her from falling but they both fell.

Regardless of whether plaintiff assaulted Saavadra and pushed her down or whether she slipped, there is no dispute that a disturbance involving plaintiff and Saavadra occurred outside of their house during the early

4

morning hours on July 12, 2017.

After being on the ground, Saavadra got up and ran back to their house and locked plaintiff outside because she was afraid of him and did not want to argue with him any more.

Plaintiff then began knocking on the front door and trying to break it down to get in the house. Saavadra stated that she feared for her safety and called 911 to request police assistance. In her call to 911, Saavadra stated that plaintiff "dragged her on the floor" and was "breaking things."

Plaintiff then knocked the front door off of its hinges and entered the house. He then went upstairs to the couple's bedroom and got into bed.

About five minutes after Saavadra's 911 call for police assistance, SPD Police Officer Kyle Calvey arrived at the house. SPD Officer Griffiths then arrived a few minutes later.

Based on Griffiths' testimony and his Affidavit of Probable Cause to arrest plaintiff, Saavadra advised Griffiths that she was assaulted by plaintiff after an argument as detailed above.

Both Officers observed that the house's front door was off the hinges and that several of the house's windows were broken. They also observed that Saavadra's clothes were dirty and that she was extremely upset and crying. After speaking with Saavadra, the Officers went upstairs to the couple's bedroom where they found plaintiff lying face-down on the bed. Both Officers entered the bedroom, and Griffiths announced their presence as police officers and directed plaintiff to get up. Plaintiff did not respond and

remained laying in the bed.

The version of the events that then transpired in the bedroom differ between plaintiff and Officers Griffiths and Calvey. Saavadra did not go into the bedroom during the relevant time and did not see the Officers after they entered the bedroom. Nor did the children of plaintiff and Saavadra, who were home at the time, witness the incident in the bedroom.

According to the Officers, plaintiff refused to follow Griffiths' order to get up off of the bed and Griffiths then advised plaintiff that he was being arrested. With Calvey's help, Griffiths put plaintiff's right hand in a handcuff as he still lay on his bed. Griffiths then tried to grab plaintiff's left hand to put in the handcuff, and plaintiff pulled his hand away and slid it up underneath his pillow. When this occurred, Griffiths ordered plaintiff to surrender his left hand so it could be placed in the handcuff. The Officers then stated that plaintiff refused and actively resisted giving them his left hand to be handcuffed.

The Officers testified that they felt threatened and feared for their safety when plaintiff refused to give them his left hand and stated that they did not know if he had a weapon in his hand under the pillow.

In order to get plaintiff to comply with the order, there is no dispute that Griffiths then punched plaintiff twice in the face with a closed fist. After being punched by Griffiths, plaintiff surrendered his left hand to be handcuffed. When both of plaintiff's hands were handcuffed, Griffiths did not use any further force on plaintiff.

6

In his testimony, plaintiff stated that when the Officers entered his bedroom, he was "100 percent" compliant with their commands and he was willing to cooperate with them "100 percent." He stated that he was half asleep and in his bed when they entered the bedroom to arrest him and that he was not a threat to either Officer. Plaintiff also stated that he was not armed with any weapons and that Saavadra did not want him arrested.

After plaintiff was arrested and handcuffed, the Officers transported him to SPD Headquarters to be processed. Plaintiff's face was bleeding from Griffiths' punches and he requested medical treatment. Medical personnel were eventually called and they took plaintiff to a hospital for treatment to his face. After conducting tests at the hospital, plaintiff sustained facial fractures and was advised to see a specialist to determine if he needed surgery in the future. Plaintiff testified that he still experiences headaches as well as other ailments as a result of Griffiths' punches. Also, Saavadra saw plaintiff's blood on the mattress after he was arrested and cleaned it up.

As a result of the July 12, 2017 incident and plaintiff's arrest, he was incarcerated for 9 to 10 days. He was also charged with simple assault, harassment and resisting arrest. After his release from prison, plaintiff returned to his house with Saavadra.

Subsequently, plaintiff pled guilty in Lackawanna County Court to simple assault and harassment pursuant to a plea agreement, and the resisting arrest charge was withdrawn.

## III.   DISCUSSION[2]

In their motion for summary judgment, defendants raise several contentions as to why they are entitled to judgment in this case. First, they argue that plaintiff has failed to produce any evidence that a policy, custom or practice of the City of Scranton resulted in the alleged violation of his constitutional rights. They next argue that Officer Griffiths' use of force to effectuate plaintiff's arrest was objectively reasonable under the circumstances. Third, they maintain that Officer Griffith is entitled to qualified immunity from plaintiff's excessive force claim. They further contend that Officer Griffith is entitled to immunity from plaintiff's state law assault and battery claims pursuant to the PSTCA. Finally, they argue that plaintiff's claim for punitive damages against them is barred as a matter of law.

### A. Claims Against Officer Griffiths in his Official Capacity

Plaintiff has sued Griffiths in both his individual and official capacity. The court finds that the claims against Griffiths in his official capacity should be dismissed since he is being sued as an Officer of the SPD, which is not a legal entity that may be sued separately from the City under §1983. *See* Wiggins v. McAndrew, 2018 WL 3727389 (M.D.Pa. Aug. 6, 2018).

Thus, plaintiff's claims against Officer Griffiths in his official capacity

---

[2]Since the proper standard regarding a summary judgment motion under Fed. R. Civ. P. 56(c) is stated in the briefs of the parties, the court does not repeat it herein. *See also* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).

under §1983 cannot proceed "because these claims are viewed as claims against the [City]." Credico v. West Goshen Police, 2013 WL 6077168, \*3 (E.D.Pa. Nov. 18, 2013) (citing " Kentucky v. Graham, 473 U.S. 159, 165-166 (1985)("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity .... It is not a suit against the official personally, for the real party in interest is the entity.").

As such, plaintiff's claim under §1983 against Officer Griffiths in his official capacity will be dismissed with prejudice. *See* Credico, 2013 WL 6077168, \*5 ("a claim against an official in his official capacity is considered a claim against the entity, i.e., [the City of Scranton].").

## B. Count I – Section 1983 Excessive Force Claim Against Griffiths

The court will now examine whether there exists disputed material facts which preclude summary judgment regarding Count I of the plaintiff's complaint, i.e., his excessive force claim against defendant Griffiths. In Count I, the plaintiff alleges that the force used by Griffiths during his arrest and in handcuffing him was excessive, objectively unreasonable, and a violation of the Fourth, Eighth and Fourteenth Amendments.

Initially, the court finds that plaintiff's excessive force claim does not fall under the Eighth Amendment as cruel and unusual punishment nor under the Fourteenth Amendment as a due process violation.

In United States v. Lanier, 520 U.S. 259, 272 n.7,117 S.Ct. 1219 (1997), the Supreme Court held that "if a constitutional claim is covered by a specific

constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." In Albright v. Oliver, 510 U.S. 266, 273, 114 S.Ct. 807, 813 (1994), the Court held that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (internal quotation marks omitted); Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 260–61 (3d Cir. 2010).

"In addressing an excessive force claim brought under section 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." Albright, 510 U.S. at 271.

"Where . . . the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." Graham v. Connor, 490 U.S. 386, 394 (1989). The Fourth Amendment provides protection for "those actions which occur between arrest and pre-trial detention." Donahue v. Gavin, 280 F.3d 371, 381 (3d Cir. 2002). "Thereafter, the Due Process Clause of the Fourteenth Amendment provides continuing protection." Bodnar v. Wagner, No. CIV.A. 3:07-CV-2038, 2010 WL 56097, at *6 (M.D. Pa. Jan. 5, 2010) (citing James v. York County Police Dep't, 160 Fed. Appx. 126, 131 (3d Cir. 2005)).

The Third Circuit has clearly held that the Fourth Amendment applies at least during the arrest and during transportation of the arrestee to the police station. *See* Groman v. Twp. of Manalapan, 47 F.3d 628, 633-34 (3d Cir. 1995). In this case, plaintiff's excessive force claim against Griffiths alleging that the Officer used excessive force is covered by the Fourth Amendment. *See* Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004) ("The Supreme Court has held that all claims of excessive force by police officers, in the context of an arrest, investigatory stop, or other 'seizure', should be analyzed under the Fourth Amendment."). The facts in this case demonstrate that plaintiff was in the process of being arrested and detained by police officers when he was punched twice in the face by Griffiths.

Thus, since plaintiff's excessive force claim squarely arises under the Fourth Amendment, plaintiff's claim under the Eighth and Fourteenth Amendments, *as a stand alone claim*, will be dismissed with prejudice based on the "more-specific-provision rule."

The court, however, construes plaintiff's reference to the Fourteenth Amendment as relying on the incorporation doctrine to support his Fourth Amendment excessive force claim against a state actor and municipality. "Under the incorporation doctrine, the Fourth Amendment and other provisions of the Bill of Rights apply on their face only to the federal government, and were incorporated against the states later by operation of the Fourteenth Amendment's Due Process Clause." Williams v. Papi, 30 F.Supp.3d 306, 311-12 (M.D.Pa. 2014).

Since plaintiff's excessive force claim is governed by the Fourth Amendment, the court must now analyze the claim under the Fourth Amendment's "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386 (1989). "[W]hether the force used . . . is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396. More specifically, the "objective reasonableness" standard requires the court to consider "whether under the totality of the circumstances, the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004) (citing Graham, 490 U.S. at 397). Relevant factors to consider include the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. The Third Circuit has articulated additional factors that are relevant to its assessment of "objective reasonableness," which include "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997).

"Because such a determination depends on 'all of the relevant facts and circumstances leading up to the time that the officers allegedly used excessive force,' the Third Circuit has held that '[t]he reasonableness of the use of force is normally an issue for the jury.'" Papi, 30 F.Supp.3d at 312.

Defendants argue that the undisputed facts show plaintiff resisted arrest and repeatedly refused their directives while trying to handcuff him which lead to their belief that he may have been reaching for a weapon when he slid his left hand under his pillow. As such, they contend that Griffiths and Calvey had a reasonable basis to conclude that they may be in danger causing Griffiths to punch plaintiff twice in the face to subdue him. Defendants also state that Griffiths used only the force necessary to effectuate plaintiff's arrest and that after plaintiff was handcuffed, no further force was used.

Here, as detailed above, the evidence is disputed as to whether the actions of Griffiths in punching plaintiff in the face twice to subdue him while he was laying in bed with one of his hands cuffed were objectively unreasonable and in violation of the rights afforded to plaintiff by the Fourth Amendment. The facts also demonstrate that after being punched by Griffiths, plaintiff had to be treated at a hospital and he claims that he sustained severe and serious injuries, some of which are permanent. Even though plaintiff was being arrested for a violent crime, at the time the Officers arrived, plaintiff had gone to bed and he stated that he was asleep and posed no threat to the officers. Further, plaintiff had no weapon at the time and despite the fact that his right hand was already cuffed and two Officers were present, Griffiths

13

punched him twice in the face in order to cuff his left hand. The entire incident occurred inside plaintiff's bedroom while he was in his bed, and the facts are disputed as to whether plaintiff posed a threat to the Officers during the incident. Viewing the facts in a light most favorable to the non moving party, the court finds that a jury must resolve the question of whether Griffiths' conduct was objectively reasonable under the circumstances and, or whether it amounted to excessive force in violation of the Fourth Amendment.

Thus, defendants' motion for summary judgment with respect to plaintiff's excessive force claim against Griffiths in his individual capacity will be **DENIED** and this claim will proceed to trial.


### C. Punitive Damages

As relief in his complaint, it appears that plaintiff is seeking punitive damages in addition to compensatory damages. It is not clear if he is seeking punitive damages against both the City and Griffiths. With respect to punitive damages for a [§1983](§1983) violation, this remedy is only available "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." [Smith v. Wade, 461 U.S. 30 (1983)](). Regarding federal civil rights claims, "reckless indifference" refers to the defendant's knowledge of the illegality of his actions, not the egregiousness of his actions. [Alexander v. Riga, 208 F.3d 419, 431 (3d Cir. 2000)]() (citing [Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999)]()).

The court finds that the plaintiff cannot recover punitive damages against the City and against Griffiths, to the extent he sues Griffiths in his official capacity, since this is, in effect, a claim for punitive damages against the City of Scranton. The Supreme Court has held that punitive damages may not be awarded against municipalities under §1983. *See* City of Newport v. Fact Concerts, Inc., 453 US 247, 271 (1981). Thus, any claim for punitive damages against the City of Scranton, and Griffiths in his official capacity, are subject to dismissal with prejudice.

Insofar as the plaintiff is suing Griffiths in his individual capacity, the court finds that he has presented sufficient evidence to have a jury decide if Griffiths acted with "reckless indifference" with respect to his knowledge of the illegality of his actions in punching plaintiff twice in the face. The evidence plaintiff presented, although disputed, is enough to allow his request for punitive damages with respect to his excessive force claim under §1983, against Griffiths, to proceed. *See* Alexander v. Riga, 208 F.3d at 430-31.

Based on the same rationale, plaintiff can also proceed on his claim for punitive damages against Griffiths with respect to his two state law claims. *See* Phillips v. Cricket Lighters, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005) (Under Pennsylvania law, "[p]unitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others.").

As such, defendants' motion for summary judgment with respect to

plaintiff's claim for punitive damages against Griffiths, in his individual capacity for all three of his claims, Counts I-III, will be **DENIED**.

### D. Qualified Immunity of Officer Griffiths

Defendants argue that Griffiths is entitled to qualified immunity with respect to the plaintiff's Fourth Amendment excessive force claim against him individually. The common law privilege of qualified immunity protects public officials who have undertaken discretionary acts from suit "to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" Harlow v. Fitzgerald, 457 U.S. 800, 806, 102 S.Ct. 2727 (1982). It is "an immunity from suit rather than a mere defense to liability." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808 (2009).

District courts must use a two-prong test to analyze claims of qualified immunity. Pearson v. Callahan, 555 U.S. at 232. Courts must determine if: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" and (2) "whether the right was clearly established." *Id*.; Saucier v. Katz, 533 U.S. 194, 201 (2001) *abrogated in part by Pearson*, 555 U.S. 223; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007). If there was a violation of a constitutional right and the right was clearly established, then qualified immunity does not apply. Thus, the defendants may defeat a claim by establishing either prong of the analysis. Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be

addressed first in light of the circumstances of the particular case." *Id*. at 236.

Under the first *Saucier* prong, the court finds that the facts are disputed as to whether Griffiths' actions of punching plaintiff in the face violated the plaintiff's Fourth Amendment right to be free from excessive force during his arrest. As discussed, the evidence is disputed as to "whether under the totality of the circumstances, [Griffiths'] actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989).

The court also finds that qualified immunity is not warranted based on the second *Saucier* prong.

A public official is entitled to qualified immunity if the constitutional right at issue was not clearly established. Saucier, 533 U.S. at 201. Before concluding that a clearly established right exists, "the court must define the right allegedly violated at the appropriate level of specificity."; Williams v. Bitner, 455 F.3d 186, 191 (3d Cir. 2006). The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202. This does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S.Ct. 2074, 2083 (2011).

Here, the Fourth Amendment right of a person to be free from excessive force by police officers during an arrest was clearly established on July 12,

2017, and the contours of this right were sufficiently clear that a reasonable officer would understand that if a person was not resisting and posed no threat to anyone's safety, as plaintiff's evidence shows, then punching the person in the face twice violated that right. Thus, despite defendants' evidence that shows Griffiths' actions were reasonable under all of the circumstances due to plaintiff's behavior and failure to obey the Officers' commands, the court has found disputed facts exist regarding plaintiff's Fourth Amendment claim precluding qualified immunity from shielding Griffiths.

Therefore, defendants' motion for summary judgment with respect to their contention that Griffiths is entitled to qualified immunity as to plaintiff's Fourth Amendment excessive force claim is **DENIED**.

### E. Pennsylvania State Law Claims Against Griffiths, Counts II & III

The plaintiff raises claims for assault and battery against Griffiths under Pennsylvania state law. Defendants maintain that Griffiths is immune from any state law claims under the Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa.C.S.A. §§8541, *et seq*. Section 8541 of the PSTCA provides that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." "The PSTCA grants local agencies immunity from liability for damages caused by agency employees, subject to eight specifically enumerated statutory exceptions." Credico, 2013 WL 6077168, *2; *see also*

18

42 Pa.C.S.A. §8542. The plaintiff is not asserting a cause of action for negligence against Griffiths, and his claims do not fall into one of the eight enumerated exceptions.

The defendants state that Griffiths is immune under the PSTCA for any alleged damages based on the actions he took within the scope of his duties and since there is no evidence to show that Griffiths acted with a malicious intent to harm or injure plaintiff. Plaintiff argues that since his evidence shows Griffiths' conduct amounted to actual malice or willful misconduct, Griffiths is not entitled to immunity from his assault and battery claims under the PSTCA.

In Vargas v. City of Phila., 783 F.3d 962, 975 (3d Cir. 2015), the Third Circuit held that the "PSTCA provides immunity to municipalities and its employees for official actions unless the employee's conduct goes beyond negligence and constitutes 'a crime, actual fraud, actual malice, or willful misconduct.'" No doubt that an additional exception under the PSTCA exists for public employees whose actions have been deemed a "crime, actual fraud, actual malice or willful misconduct" by judicial determination. 42 Pa.C.S.A. §8550. Under Pennsylvania law, "willful misconduct" has been defined to mean "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." King v. Breach, 540 A.2d 976, 981 (Pa. Cmwlth. 1988) (citing Evans v. Philadelphia Transportation Co., 212 A.2d 440 (Pa. 1965)). Thus, "the term 'willful misconduct' is synonymous with the term 'intentional tort.'" King, 540 A.2d at 981.

19

The court finds that plaintiff has presented sufficient evidence to show that the conduct by Griffiths, if believed by a jury, would fall outside the scope of immunity provided for in the PSTCA. In light of the disputed evidence, the jury must determine if Griffiths' use of force amounted to willful misconduct or if he acted with a malicious intent to harm plaintiff.

As such, the defendants' motion for summary judgment with respect to plaintiff's state law tort claims for assault and battery, Counts II and III, against Griffiths will be **DENIED** since factual disputes exist as to whether this defendant is immune under the PSTCA. Factual disputes also exist as to the substance of both of plaintiff's state law claims against Griffiths and they will proceed.

### F. Count I – City of Scranton's Municipal Liability

The defendants also move for summary judgment regarding Count I of the complaint relating to the City of Scranton's municipal liability for allegedly having a custom or policy to allow its officers to use excessive force on people while they are being arrested. In their motion, defendants argue that the plaintiff failed to produce sufficient evidence to establish his claim against the City under *Monell* in Count I. Specifically, defendants contend that plaintiff has not established any policy, custom or practice of the City that led to the alleged violation of his Fourth Amendment rights while he was being arrested. Thus, defendants assert that the City is entitled to summary judgment with respect to plaintiff's constitutional claim. Plaintiff argues that the facts show

Griffiths acted as the policymaker in deciding what amount of force was required to subdue him during his arrest, and that he has shown Griffiths' conduct amounted to excessive force a violation of his Fourth Amendment rights.

With respect to the City, plaintiff simply avers in his complaint, (Doc. 1 at 2), that the City "is responsible for the actions of [Officer] Griffiths", and that "the conduct of [ ] Griffiths, was the direct result of the policy, practice, custom and deliberate indifference of [the City]."

Since plaintiff names the City as a defendant and alleges that it violated his constitutional rights, the standards annunciated in Monell v. Department of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018 (1978), apply to his claim against it. *See* Moeck v. Pleasant Valley School Dist., 983 F.Supp.2d 516, 524 (M.D.Pa. 2013). A municipality is a "person" for purposes of §1983. *See* Bd. of the County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403 (1997). But §1983 does not allow municipal liability under a theory of *respondeat superior*. Id. A municipality is not liable under §1983 merely for employing someone who violates a person's civil rights; rather, a municipality that does not directly violate a person's civil rights is liable only where it has in place a policy or custom that led to the violation. Id. "Municipal liability only attaches when a plaintiff demonstrates that an official policy or custom caused the asserted constitutional deprivation." Moeck v. Pleasant Valley School Dist., 983 F.Supp.2d at 524; Mann v. Palmerton Area School Dist., 33 F.Supp.3d 530, 540-41 (M.D.Pa. 2014) ("Municipal liability only attaches when

21

a plaintiff demonstrates that an official policy or custom caused the asserted constitutional deprivation.") (citation omitted). The plaintiff bears the burden of identifying the policy or custom. *Id*. This rule ensures that a municipality will only be liable where it is the "moving force" behind the plaintiff's injury. Id.

A court may find that a municipal policy exists when a "'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)). It is also possible for a court to find the existence of a municipal policy in "the isolated decision of an executive municipal policymaker." City of St. Louis v. Praprotnik, 485 U.S. 112, 139 (1988). "A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." Andrews, 895 F.2d at 1480 (citations omitted). There must be a "direct causal link" between the municipal policy or custom and the alleged constitutional violation. City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989); Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 249–50 (3d Cir. 2007) (citation omitted).

Additionally, "the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 405, 117 S.Ct. 1382 (1997).

Plaintiff now argues that the City can also be held liable with respect to his constitutional claim even though he concedes that the City did not have any policy authorizing "police brutality." Rather, he contends that his Fourth Amendment rights were violated by an act of a policymaker, i.e., he claims that "Griffiths was in effect the policymaker when it came to dealing with [him] on July 12, 2017." Thus, plaintiff contends that despite the lack of a policy, the City can be held liable since "federal law has been violated by an act of the policymaker itself." Plaintiff states that since Griffiths was "one of the dispatched officers to arrive at [his] residence on July 12, 2017, he was the policymaker for carrying out patrolman duties and arrests that night." Plaintiff contends that Griffiths was the one who made all of the decisions regarding his arrest. Plaintiff points out that Griffiths testified that he did not ever have to consult with any other representative of the City when making arrests and, that it was not the policy or custom of the City to have any interdepartmental meetings to discuss cases or incidents out of the ordinary that may arise.

Although , section 1983 does not allow municipal liability under a theory of *respondeat superior*, Brickell, 658 F. Supp. 2d at 626-27, it is possible to find the existence of a municipal policy in "the isolated decision of an executive municipal policymaker." Praprotnik, 485 U.S. at 139. Here, the court finds that there is insufficient evidence to show that Officer Griffiths, a patrolman, was an executive policymaker or an authorized decisionmaker for the City regarding the amount of force required to effectuate a suspect's arrest. Rather, the evidence shows that plaintiff is attempting to hold the City

liable on his excessive force claim based only on *respondeat superior*. If plaintiff's assertion was correct, then the City could be held liable for every arrest made by one of its patrolmen despite the holding in *Monell* which requires much more.

Further, plaintiff states in his brief in opposition that "Scranton provides inconsequential training to its police staff at best, particularly when it comes to handling domestic violence", since "Griffiths testified that Scranton's police officers have to undergo some type of training regarding how to handle domestic altercations, [but], [he] could not recall when he last underwent any kind of domestic violence training." However, Count I of the complaint does not include a municipal liability claim against the City based on its failure to train police officers regarding responding to domestic violence incidents. To the extent plaintiff attempts to add a failure-to-train claim against the City under *Monell* in his brief in opposition,"[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." Heim v. York Cnty. Prison, 3:CV-10-1369, 2013 WL 1414638 (M.D. Pa. Apr. 8, 2013)(citing Pennsylvania ex rel. Zimmerman v. Pepsico, Inc., 836 F.2d 173, 181 (3d Cir.1988)).Thus, the court will not consider this additional claim.[3]

---

[3]The court notes that even if it did consider a failure-to-train claim against the City, plaintiff did not produce sufficient evidence showing that any training deficiency by the City's police department was causally connected to Griffiths' actions during his arrest. Further, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick v. Thompson, 563 U.S. 51, 62 (2011). No evidence of any such pattern was produced in this

Therefore, the court will **GRANT** defendants' motion for summary judgment with respect to Count I of the complaint as it relates to the City since plaintiff's evidence is insufficient to support an actionable *Monell* claim against it. Additionally, the court will enter judgment in favor of the City since it is only named as a defendant in Count I.

## IV.    CONCLUSION

In light of the foregoing analysis, the court will **GRANT IN PART** and **DENY IN PART** the defendants' motion for summary judgment. (Doc. 17). The court will **DENY** the defendants' motion with respect to Officer Griffiths and plaintiff will be permitted to proceed with his claims in Counts I-III against Griffiths to the extent stated above. The court will **GRANT** the defendants' motion with respect to the City and plaintiff's §1983 claim against the City in Count I, and it will enter **JUDGMENT** in favor of the City. An appropriate order shall follow.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATED: February 5, 2019**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2017 MEMORANDA\17-2398-01.wpd

---

case. Nor has plaintiff shown that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton, Ohio v. Harris, 489 U.S. 378, 390 (1989).